INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., Brian Rumbaugh, and Michael Mager, on behalf of themselves and all other members of International Society for Krishna Consciousness, Inc., Plaintiffs,

v.

The CITY OF NEW YORK, a municipal corporation, and Robert McGuire, as Commissioner of Police of the City of New York, Defendants.

No. 79 Civ. 1118 (CBM).

United States District Court, S. D. New York.

Aug. 22, 1980.

---

Levy, Gutman, Goldberg & Kaplan by Jeremiah S. Gutman, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel, New York City, Mark L. Schwartz, New York City, of counsel, Legal Bureau, New York City Police Dept. by Richard L. Reers, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiffs are the International Society for Krishna Consciousness, Inc. ("ISK-CON"), and two of its individual members. Plaintiffs have brought this action individually and on behalf of all members of ISK-CON against the defendant City of New York and its Police Commissioner, defendant Robert McGuire. Plaintiffs allege that their rights under the First and Fourteenth Amendments to the United States Constitution have been violated and seek declaratory and injunctive relief. Jurisdiction of this court is invoked under 28 U.S.C. §§ 1331, 1343(3) & 1343(4).

For the reasons set forth in the court's findings of fact and conclusions of law dated December 4, 1980, the court denied plaintiffs' motion for a preliminary injunction. The matter is now before the court following a bench trial on the merits. Pursuant to the agreement of the parties, the evidence received during the court's preliminary injunction hearing of May 3 and 8, 1979, was made part of the trial record.

Plaintiff's complaint requests the following relief:

[A declaration] that the policy of the City of New York, as executed and enforced by the New York City Police Department, of prohibiting plaintiffs from performing Sankirtan, a protected First Amendment activity, on the sidewalks of New York City between 42nd and 48th Streets on the east side of First Avenue, abridges plaintiffs' free exercise of religion and freedoms of speech and association, all in violation of the First and Fourteenth Amendments to the United States Constitution and of 42 U.S.C. § 1983.

[An order enjoining] defendants and their respective agents, servants and employees from prohibiting or attempting to prohibit plaintiffs from performing Sankirtan on the sidewalks of New York City between 42 and 48th Streets on the east side of First Avenue, or participating or causing in any way plaintiffs' arrest on any charge when plaintiffs are so exercising or attempting to exercise their rights.

Thus, the narrow issue before this court is whether plaintiffs' constitutional rights are violated by a policy of the New York City Police Department which bars plaintiffs from proselytizing and soliciting funds on the sidewalks of New York City between 42nd and 48th Streets on the east side of First Avenue.

*Findings of Fact*

ISKCON is a religious society. The proselytizing and soliciting of funds in which plaintiffs wish to engage is part of a religious ritual known to plaintiffs as Sankirtan. Sankirtan is mandated by the Vedic Scriptures, ISKCON's basic religious text.

Plaintiffs seek access to perform Sankirtan on the sidewalks on the east side of First Avenue, adjacent to the United Nations ("U.N."). The U.N. holds title to the area in New York City in which its Headquarters is located–the area between 42nd Street on the south, 48th Street on the north, Franklin D. Roosevelt Drive on the east, and the east side of First Avenue on the west. The City of New York owns the sidewalk in front of the U.N. Headquarters on the east side of First Avenue between 42nd and 48th Streets. The east side of First Avenue is now open to pedestrian traffic. While this area was originally deeded by the New York State Legislature to the U.N., the U.N. subsequently transferred the east side of First Avenue back to the City of New York for security reasons.

The New York City police do not have jurisdiction to arrest persons on any property to which the U.N. holds title. The above described property to which the U.N. holds title is located behind a readily scalable fence bordering the easternmost border of the sidewalk on the east side of First Avenue between 42nd and 48th Streets. The property to which the U.N. holds title is under the jurisdiction of the U.N. and is patrolled by U.N. security guards.

The New York City Police Department has been designated as the proper governmental authority to guarantee the peace and tranquility of the U.N. Headquarters. In order to carry out this responsibility, the New York City Police Department has decided, among other things, to ban all First Amendment activity on the east side of First Avenue between 42nd and 48th Streets, thus creating a buffer zone between the U.N. Headquarters and possible security risks. The east side of First Avenue, as well as the adjacent area to the west–the west side of First Avenue between 42nd and 48th Streets between First and Second Avenues–is specially patrolled by the City of New York, pursuant to the "Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations," 22 U.S.C.A. § 287, historical note § 16 ("U.N. Agreement").[1] Accordingly, the New York City Police Department has also designated six areas recommended for

1. The pertinent provisions of the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations are as follows:

SECTION 16

(a) The appropriate American authorities shall exercise due diligence to ensure that the tranquility of the headquarters district if not disturbed by the unauthorized entry of groups of persons from outside or by disturbances in its immediate vicinity and shall cause to be provided on the boundaries of the headquarters district such police protection as is required for these purposes.

(b) If so requested by the Secretary General, the appropriate American authorities shall provide a sufficient number of police for the preservation of law and order in the headquarters district, and for the removal therefrom of persons as requested under the authority of the United Nations. The United Nations shall, if requested, enter into arrangements with the appropriate American authorities to reimburse them for the reasonable cost of such services.

demonstrations and picketing within the area bounded by the west side of First Avenue between 42nd and 48th Streets and Second Avenue.[2] The New York City Police Department has agreed to allow plaintiffs to exercise their First Amendment rights at any place in the area except the east side of First Avenue and directly in front of the United States Mission to the U.N. on the southwest corner of 45th Street and First Avenue.

The U.N. Visitors' Gate is located on the east side of First Avenue between 45th and 46th Streets. While plaintiffs seek access to the entire east side of First Avenue between 42nd and 48th Streets, the dispute in this case has focused primarily on the small area immediately adjacent to the U.N. Visitors' Gate.

Lieutenant John J. Judge, an operations officer for the New York City Police Department responsible for regulating demonstrations and other forms of First Amendment activity in the proximity of the U.N., testified that the Police Department would not have any objection to the plaintiffs performing Sankirtan on any of the cross streets in the area–43rd, 44th, 45th, 46th, and 47th Streets between First and Second Avenues–except in front of the United States Mission. (Tr. 202–03).[3] Lieutenant Judge testified that demonstrations and other First Amendment activity is allowed on the west side of First Avenue as well. (Tr. 214). Thus, Lieutenant Judge testified that plaintiffs could go any place they would wish without objection by the Police Department, except the sidewalk on the east side of First Avenue between 42nd and 48th Streets, and in front of the United States Mission. (Tr. 206–07).[4]

2. Defendants' Exhibits H, I, and J are three internal police department memoranda, and are the only writings presented in this proceeding which discuss the police department policy in the U.N. area. While defendants' counsel argued at the preliminary injunction hearing that the policies in these exhibits applied to plaintiffs, in addition to picketers and demonstrators, a careful reading of the transcript reveals that Lieutenant Judge never testified that these exhibits had been applied to the performance of Sankirtan by plaintiffs.

Exhibit H, entitled "Laws Relating to the Protection of the United Nations Headquarters District" and dated September 16, 1970, discusses police designation of areas for picketing and assembly (¶ 11), regulation of assemblies and demonstrations (¶ 12), the lawfulness of leafletting (¶ 13), and the carrying of signs and placards (¶ 14). In a passage somewhat at odds with the position of defendants in the present action, Exhibit H notes a New York Court of Appeals case which requires at least three persons assembling at a given time and place in order to support a conviction for congregating under the disorderly conduct statute. *See People v. Carcel,* 3 N.Y.2d 327, 165 N.Y. S.2d 113, 144 N.E.2d 81 (1957). Only one paragraph in Exhibit H could be viewed as vaguely applying to plaintiffs and their performance of Sankirtan:

> 17. The above cited statutes and court cases, while applicable to all demonstrations, may be utilized by members of the force in connection with the regulation of vehicular and pedestrian traffic in the area of the United Nations as well as in the interest of assuring that the business of the dignitaries and diplomats in attendance thereat may be conducted and executed without interruption by disorderly persons or groups of demonstrators.

Exhibit I, entitled "Picketing Areas at the United Nations" and dated January 23, 1968, sets forth recommended locations for picketing. Lieutenant Judge testified that plaintiffs are not limited to the six areas in Exhibit I; there would be no objection if plaintiffs performed Sankirtan any place except the east side of First Avenue and directly in front of the U.S. Mission.

Exhibit J, entitled "Policy of Parades and Demonstrations in the Area of the United Nations Complex" and dated February 24, 1978, describes four of the six locations where demonstrations are allowed and discusses a demonstration planned for May 27, 1978. As with Exhibit I, nothing in Exhibit J suggests, even remotely, applicability to plaintiffs' performance of Sankirtan.

3. "Tr." refers to the transcript of the preliminary injunction hearing conducted May 3 and 8, 1980.

4. The New York City Police Department's policy of discouraging any continuous presence of persons on the east side of First Avenue, including the continuous presence of plaintiffs, is apparently an unwritten policy of the police department. (Tr. 208–09). The court is not oblivious to the possibility that in extreme circumstances the "continuous presence" policy may lead to discretionary decisions by police officers as to what constitutes a continuous presence. (Tr. 208–10). However, nothing in the record before the court shows that the

Lieutenant Judge testified that the sole reason for the ban on the east side of First Avenue was the peace and security of the U.N. More specifically, he testified that the ban was imposed to prevent crowd formations on the east side of First Avenue which might heighten the security risks to the U.N. and thus interfere with the peace and tranquility of the U.N. Headquarters.

The court finds that crowd formation is a serious problem in the immediate vicinity of the Visitors' Gate and on the east side of First Avenue and that crowd formation heightens the security risks. The court also finds that the practice of Sankirtan in the vicinity of the Visitors' Gate and on the east side of First Avenue tends to obstruct the flow of traffic.

The Visitors' Gate is the sole entry and exit point to the U.N. for many thousands of visitors each day. Although there is a separate entrance between 42nd and 43rd Streets for U.N. delegates and other personnel, such U.N. personnel also enter the U.N. Headquarters through the Visitors' Gate. (Tr. 99). On an average day, at least 3,000 visitors arrive at the Visitors' Gate. (Tr. 97). In addition there are 7200 staff members at the U.N. Headquarters. (Tr. 97).

The threat of crowd formation each day is exacerbated, from a security point of view, by heavy vehicular traffic near the Visitors' Gate. Each day, up to 100 tour buses and New York City buses arrive at the landing islands in the roadway near the Visitors' Gate. These landing islands are located between 45th and 47th Streets on the east side of First Avenue. (Tr. 100). These buses discharge their passengers onto the landing islands in front of, and in the immediate vicinity of, the Visitors' Gate, at times producing constant streams of pedestrian traffic on the east side of First Avenue, particularly between 45th and 47th Streets. The Police Department is therefore concerned with keeping both pedestrian and vehicular traffic moving on the east side of First Avenue between 42nd and 48th Streets.

On some occasions, the evidence disclosed, the U.N. security guard posted inside the Visitors' Gate has been required to enlist the assistance of additional U.N. security guards to disperse crowds gathered at the Visitors' Gate. (Tr. 140). U.N. security guards have requested plaintiffs to leave the immediate area of the Visitors' Gate because their practice of Sankirtan obstructed the already heavy flow of pedestrian traffic converging at the Gate. (Tr. 100). The U.N. security guards have also received during the course of their duties complaints from visitors concerning the disruptive nature of plaintiffs' solicitations and, on at least one occasion, intervened in a dispute over a contribution to plaintiffs. (Tr. 153). Plaintiffs have disregarded requests of U.N. security guards to move a distance of 100 feet from the immediate vicinity of the Visitors' Gate. (Tr. 161).

In order to forestall crowd formation on the east side of First Avenue, the New York City police officers try to discourage any continuous presence such as that of plaintiffs on the east side of First Avenue from 42nd to 48th Streets. (Tr. 170). As discussed above, there is an easily scalable fence surrounding the U.N. Headquarters. Excluding persons from any continuous presence on the east side of First Avenue allows the police to tell "at a glance" that persons are not attempting to go into the U.N. grounds by scaling the fence. (Tr. 201–02).

The court finds that the ban on all First Amendment activity on the east side of First Avenue does not totally preclude

"continuous presence" policy has been exercised in anything other than an even–handed manner. The policy has apparently been applied to not only plaintiffs, but also a local hot dog vendor and even a group of six or seven people standing on the sidewalk on the east side of First Avenue for fifteen minutes. (Tr. 211). While a police policy of discouraging a

"continuous presence" on a certain New York City sidewalk may leave something to be desired in terms of precision, under the Second Circuit standard as set forth in *Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 476–77 (2d Cir. 1980), the limited discretion exercised by the police is not constitutionally impermissible.

plaintiffs from contact with visitors to the U.N. The evidence disclosed that many visitors to the U.N. Headquarters cross First Avenue to the west side of the street. Many of these visitors then proceed to visit Dag Hammarskjold Plaza, a memorial one block away from the Visitors' Gate at 47th Street and First Avenue, and are found at several other places along the west side of First Avenue.

It is undisputed that the United Nations must maintain the degree of security necessary to guard against persons entering the U.N. Headquarters with explosives or weapons of any sort. The evidence disclosed that bombs have been found on the premises of the U.N. Headquarters, in spite of the U.N.'s own security procedures. The evidence also disclosed that, because of the controversial nature of most of the issues debated at the U.N., there are thousands of demonstrators and picketers with whom the police must deal regularly in the vicinity.

United Nations officials have expressed an interest in this litigation concerning use of the sidewalk on the east side of First Avenue, although they are not parties to this litigation. During a period of 5 years as many as 100 heads of state have visited the U.N. (Tr. 113). A U.N. employee testified that the U.N. stations a security officer at the top of the steps leading to the U.N. Headquarters. The steps are inside the Visitors' Gate, about fifteen feet from the adjacent sidewalk where plaintiffs seek to practice Sankirtan. (Tr. 107). Another U.N. security officer is posted about twenty feet inside the Visitors' Gate at a small building known as the "bomb shelter," where packages of entering visitors are checked. (Tr. 111). In addition, there are eleven New York City Police officers regularly assigned to the U.N. area between 42nd and 48th Streets and First and Second Avenues. (Tr. 211).

Much of the testimony in this action has involved "the hot dog man," a hot dog vendor who apparently places his stand in the vicinity to the Visitors' Gate with some frequency. U.N. employees have asked the hot dog man to remove himself and his stand from the vicinity of the Visitors' Gate "dozens of times." (Tr. 141–42). One U.N. employee testified that, despite calls to the police the hot dog man often returns: "We move him away. As soon as he sees the police coming, he pushes the cart away and comes right back. There is nothing you can do if he is not standing there when the policeman comes." (Tr. 142). Another U.N. security officer testified that he has asked the hot dog man to move, with apparently limited success since the hot dog man has been "around" the Visitors' Gate for almost every day during the last four years. (Tr. 162–63). This U.N. security officer testified: "I have been there on occasion when the police have moved them physically, have arrested them, have put his hot dog cart on the truck, have taken it away, but he comes back. He comes back every day. He pays the fine; comes back." (Tr. 164). Finally, Lieutenant Judge testified that the policy of the New York City Police Department is that any peddlers in the vicinity of the Visitors' Gate are given summonses and directed to move out of the area. (Tr. 202). Thus, the court finds that the New York City Police Department has enforced its policy of discouraging a continuous presence on the east side of First Avenue in a content–neutral manner.

The expert testimony and reports submitted by the parties support the court's findings of fact with respect to the security justifications of the New York City Police Department's policy. James Wegman, a New York City police officer assigned to the Crime Prevention Section, issued a report finding that any activity capable of attracting the attention of groups of visitors in the vicinity of the Visitors' Gate, including the performing of Sankirtan by plaintiffs, would cause a bottleneck effect at the Visitors' Gate and on the adjoining sidewalk. Persons would then crowd against the fence surrounding the U.N. Headquarters, thus preventing clear observation by U.N. security officers, increasing the potential for unlawful entry onto U.N. property, and enabling persons to throw objects onto U.N. property from the safety of groups: "The stoppage of normal pedes-

trian traffic at the gate would make observation, detection and apprehension of such persons virtually impossible . . . ." (Defs. Exh. BB).

Edward Halverson, president of a corporation involved in security consultation, issued a report for plaintiffs. Halverson acknowledged that there would be a "slight" interruption in the flow of pedestrian traffic resulting from solicitations by plaintiffs. Halverson offered the somewhat paradoxical view that the interruption would afford the security person at the head of the steps a *better* look at the people entering the Visitors' Gate. Halverson's report is subject to a number of criticisms. First, Halverson did not himself visit the Visitors' Gate in order to make his study, instead relying on photographs and diagrams submitted to him by another person in his corporation. Second, Halverson's report did not consider possible "rush hours" at the Visitors' Gate. Third, Halverson suggested during his deposition testimony that from a security point of view he would recommend that if plaintiffs were going to be stopping people that they should stand "somewhere around seventy–five to one hundred fifty feet to the other side of the gate." (Pl.Exh. 1–B at 25–26). Finally, and most importantly, Halverson's view that crowd formation around the Visitors' Gate would aid security is oversimplistic, overlooking the problems associated with crowd formation described in the Wegman report.

Project for Public Spaces, Inc., a non–profit corporation of designers and social scientists who specialize in projects designed to find out how people use public spaces, issued a report for plaintiffs. Fred Kent, president of the corporation, also testified at trial and showed portions of time lapse film and documentary footage to the court at trial. (Pls. Exhs. 1–F, 1–G, 1–H, 1–I, 1–J, 1–K, 1–L). Despite the impressive credentials of Kent and his corporation, and despite the methodological tour de force illustrated by their report, both the report and Kent's testimony are subject to a number of criticisms which cast considerable doubt upon the validity of their conclusions. The report concluded that one person per-

forming Sankirtan on either side of the Visitors' Gate: 1) would not significantly impede access to the U.N. building and plaza; 2) would not detract from the use of the sidewalk fronting the Visitors' Gate; 3) would not negatively affect the enjoyment of users of the U.N. plaza and fronting sidewalk; and 4) would not have a noticeable affect on the overall perception of users of the area in question. Unfortunately, the report was based on the assumption that the performance of Sankirtan would at all times involve only two parties, one member of ISKCON and one "listener." The report did not take into consideration the possibility that the listener may be accompanied by friends or family members who would stop and listen as well. More importantly, the report did not take into consideration the possibility that, despite any efforts by the ISKCON member to the contrary, the practice of Sankirtan may attract a crowd–either of curious passersby who are eager to listen or of hostile intervenors should any controversy develop between the ISKCON member and a reluctant listener. While plaintiffs profess not to intend the attraction of crowds, the evidence before the court nonetheless establishes the serious probability of crowd formation when plaintiffs' plans go awry.

A second, and perhaps more serious, problem is the fact that the observations and film upon which the report and Kent's testimony are based were made on a Saturday, April 26, 1980. The U.N. is not in session on Saturdays. While Kent ventured his opinion that Saturday would be the day of the week with the most visitors arriving at the U.N., the evidence established that on a weekday many of the U.N.'s 7200 staff members would also be using the Visitors' Gate. Thus, it is likely that the total volume of persons entering and leaving through the Visitors' Gate is much higher on weekdays than on a Saturday. In addition, it is likely that pedestrian traffic on the sidewalks in the area is heavier on weekdays than on a Saturday, due to the presence of workers from other offices in the area. Finally, it is likely that "rush

hours" at the Visitors' Gate are more intense on weekdays than on a Saturday, due to the inevitable tendency of workers at the U.N., or at any other workplace, to enter and leave within relatively short time spans–that is, arriving at a certain hour in the morning, leaving and returning during the lunch hour, and departing at the end of the day. Of course, the court is in no position to make a final assessment of the distinctions between weekday pedestrian traffic and Saturday traffic–that is a task best left to experts such as Kent. But the point is that the report in question did not take these factors into consideration and, as a matter of common sense, its conclusions are somewhat questionable.

Finally, it should be noted that neither the report nor Kent's testimony considered the problem from a security viewpoint. While plaintiffs did attempt to introduce Kent's testimony on this point, Kent was not properly qualified as an expert on security. Even assuming that the performance of Sankirtan would have no adverse effects in terms of pedestrian traffic or aesthetics, there remains the possibility that the continuous presence and activity of plaintiffs may result in occasional crowd formation, and that any crowd formation would impair the security in the vicinity of the Visitors' Gate. The fact that Kent may have observed occasional groups or individuals waiting for short periods of time in the vicinity does not totally negate the possibility that the continuous presence of individuals, engaged in activity which could result in crowd formation, would pose a more serious security threat. In any case, it requires no expertise to surmise that the continuous presence of two individuals proselytizing and soliciting funds by the Visitors' Gate entails different security considerations from the relatively brief presence of waiting groups, individuals reading maps, couples conversing, or families feeding pigeons.

*Conclusions of Law*

Plaintiffs seek access to the particular audience that comprises U.N. visitors because of the international character of these visitors. Plaintiffs also view visitors as people who are at leisure, not walking to or from their places of employment, and accordingly more receptive to plaintiffs' religious message. Plaintiffs assert that by barring access to these visitors on the east side of First Avenue, the New York City Police Department has violated plaintiffs' First Amendment rights. In this connection, and as a result of attempts to settle this dispute before trial, plaintiffs now seek to place one member of their group on either side of the Visitors' Gate, thereby reducing the risk of obstruction to the flow of traffic. Plaintiffs have insisted that since they are interested only in one–to–one communications, their activities thus limited will not cause an assemblage of persons near the Gate.

The standard applicable to time, place, and manner restrictions in the Second Circuit has been set forth in *Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 473–74 (2d Cir. 1980) [citations omitted]:

The right to a public forum for the discussion and interplay of ideas is one of the foundations of our democracy. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.". . .

However, the right to speak, assemble, and discuss is not absolute. Although the "government has no power to restrict such activity because of its message", . . . it is "equally clear . . . that reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests, and are permitted". . . . The Supreme Court recently stated "We have often approved restrictions [on time, place and manner] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information". . . . The balancing process which

is required in these situations was best described by Justice Blackmun: "Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question". . . .

Thus, once the restrictions are found to be content–neutral, and it is determined that alternative avenues of communication are available, the question becomes one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech–related activity. . . .

The court is not unaware that the majority opinion of the Second Circuit panel in *Concerned Jewish Youth* has been the subject of much criticism, most notably by Judge Mansfield in his dissenting opinion. *Id.* at 478, 483 (Mansfield, J., dissenting) ("With due respect, the majority in my view abdicates its responsibility for insuring that First Amendment rights are not lightly cast aside or ignored in the name of law and order."). Unless or until the majority opinion in *Concerned Jewish Youth* is reversed or overruled, however, this court is bound to apply the standards set forth in that case to the case at hand.

In the case at hand, the court is convinced that the restriction on plaintiffs' performance of Sankirtan on the east side of First Avenue is not directed at the content of plaintiffs' speech or the religious nature of their activity. No evidence has been proffered that there is or has been any attempt to suppress the expression of plaintiffs' ideas merely because of what ISKCON members are saying. In fact, the evidence shows that the New York City Police Department has attempted to enforce the restriction of any continuous presence on the east side of First Avenue in an even–handed manner. Witnesses testified that New York City police officers have removed, arrested, and fined the hot dog man on numerous occasions. It would be a sorry state of affairs if the police were to favor the rights of a hot dog man over those of religious proselytizers. However, the fact that the hot dog man's persistent and wily efforts have frequently enabled him to evade arrest by the New York City Police Department does not, of course, disprove the content–neutral nature of the police restriction. Nor does the fact that U.N. security guards apparently tolerate the occasional brief presence of waiting groups, individuals reading maps, couples conversing, or families feeding pigeons near the Visitors' Gate necessarily disprove the content–neutral nature of the New York City Police Department restriction. Lieutenant Judge testified that police officers try to discourage any *continuous* presence on the east side of First Avenue from 42nd to 48th Streets. Thus, it is not surprising, and certainly not evidence of restrictions directed at the content of speech, that occasional tourists pausing in the area are not asked to move, but ISKCON members seeking to proselytize and solicit funds all day next to the Visitors' Gate are asked to move by the police.

There are easily accessible alternative channels for communication of ISKCON's ideas. These alternatives include the east side of First Avenue below 42nd Street and above 48th Street, the west side of First Avenue except in front of the United States Mission,[5] any of the cross streets in the area, Second Avenue, and indeed the rest of New York City except for this one narrow strip of sidewalk on the east side of First Avenue between 42nd and 48th Streets.[6] The evidence disclosed that many visitors to

---

5. First Avenue is approximately 118 feet wide. Accordingly, the alternative forum on the west side of First Avenue is only 118 feet from the forum on the east side of First Avenue sought by plaintiffs. (Defs. Letter of Aug. 19, 1980).

6. The sidewalk on the east side of First Avenue is 13 feet and 11 inches wide. (Defs. Letter of Aug. 19, 1980).

the U.N. Headquarters cross First Avenue to the west side of the street—proceeding both to Dag Hammarskjold Plaza and other places in the vicinity or other points in New York City. The court does not think that the First Amendment necessarily guarantees access to the point in New York City where plaintiffs perceive there to be the highest concentration of international tourists, at least not in a unique situation fraught with security problems. Plaintiffs may readily perform Sankirtan with international tourists in numerous other locations, most notably the west side of First Avenue.

■ The question then comes down to one of balancing the interests involved. The court appreciates that rights granted by the First Amendment are of the utmost importance, but holds that the governmental interest in the protection of the U.N. Headquarters outweighs the comparatively minor restrictions placed on plaintiffs. The Second Circuit noted in *Concerned Jewish Youth*:

> The government interest in providing security, safety and silence may, at times, be superior to asserted First Amendment rights. A statute, ordinance or regulation which embodies these interests will be valid even though it infringes on purported constitutional guarantees....

*Id.* at 474.

The New York City Police Department has a substantial interest in protecting U.N. officials and the U.N. Headquarters. The New York City Police Department, pursuant to their mandate in Section 435 of the New York City Charter, must "preserve the public peace, ... [disperse] assemblages which obstruct the free passage of public streets, sidewalks, parks and places; [and] protect the rights of persons and property ...." This includes U.N. personnel and the U.N. Headquarters. Moreover, the New York City Police Department has been designated as the proper governmental authority to guarantee the peace and tranquility of the U.N. Headquarters, pursuant to the U.N. Agreement, *supra* note 1.

The New York City Police Department's restrictions on the east side of First Avenue are simply designed to protect the U.N. Headquarters and its personnel. There have been numerous instances when bombs have been found on the premises of the U.N. Headquarters. The New York City Police Department has implemented a restriction on the east side of First Avenue because of their view that even a peaceful continuous presence by individuals on the east side of First Avenue could lead to crowd formation, an attempt to scale the fence surrounding the U.N. Headquarters, or an attempt to throw objects onto U.N. property.

While the view of the New York City Police Department may seem overly cautious, the Second Circuit in *Concerned Jewish Youth* endorsed a far more intrusive restriction limiting the plaintiffs in that case to twelve demonstrators in a "bull pen" diagonally across the street from the Russian Mission. In the case at hand, plaintiffs are not restricted to a bull pen; instead plaintiffs are free to perform Sankirtan anywhere in the vicinity except the east side of First Avenue between 42nd and 48th Streets and in front of the U.S. Mission. Thus, a relatively vast area is available in which plaintiffs may approach international tourists approaching or leaving the U.N. Headquarters. The New York City Police Department restriction is *no greater than* required to maintain the governmental interest involved in this case. The restriction on plaintiffs and others on the sidewalk adjacent to the Visitors' Gate and on the east side of First Avenue is a reasonable regulation of the "place" of plaintiffs' First Amendment activities in light of the nature of the place and the pattern of its normal activities.

Further supporting the court's holding is the fact that the restriction in question imposes only a minimal inhibition on the ability of plaintiffs to communicate their ideas. ISKCON is free to perform Sankirtan on the west side of First Avenue where many U.N. visitors pass. The audience which plaintiffs seek is international visitors. The court sees little impact on the

effectiveness of the communication, or on the ability of plaintiffs to convey their ideas to international visitors, because of the restriction in question. The fact that the police restriction only minimally inhibits plaintiffs' contact with their desired audience does not render the restriction impermissible, in light of the serious governmental interest in the protection of the U.N. Headquarters.

This case does, of course, involve the decision of the police made according to power vested in them by a municipal ordinance and by an agreement between the U.N. and the United States. Pursuant to these mandates, the New York City Police Department has decided to restrict activity on the east side of First Avenue between 42nd and 48th Streets. The court finds that the restriction imposed by the police pursuant to the mandate of New York City Charter § 435 and the U.N. Agreement is constitutionally proper. The Second Circuit reached a similar holding in its *Concerned Jewish Youth* decision:

> Although the ordinance gives the police a certain amount of latitude in protecting persons, "Condemned to the use of words, we can never expect mathematical certainty from our language".... "It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets [and presumably sidewalks] for public assemblies may be vested in administrative officials...." ... This is especially true where, as here, the ordinance has been given a narrow construction by the police department. Furthermore, here there is little real effect on the legitimate expression of ideas....

Additionally, the fact that the ordinance deals with police protection in *New York City* is of import. As Justice Frankfurter has said:

> "We must be mindful of the enormous difficulties confronting those charged with the task of enabling the polyglot millions in the City of New York to live in peace and tolerance. Street–preaching in Columbus Circle is done in a

milieu quite different from preaching on a New England village green." . . .

*Id.* at 476–77 [footnote omitted].

■ One final point that must be discussed is what the court is *not* holding in its decision today. The court is *not* holding that the New York City Police Department may constitutionally prohibit plaintiffs from performing Sankirtan in other areas, that is other than the sidewalk on the east side of First Avenue between 42nd and 48th Streets. At the close of the trial, counsel for defendants raised the somewhat surprising view that the New York City Police Department would not permit plaintiffs to perform Sankirtan on the west side of First Avenue, except in six specified locations. The court declines to hold this policy to be constitutional for a number of reasons. First, the policy described by defendants' counsel is simply contrary to the evidence before the court. Lieutenant Judge, the operations officer assigned by the New York City Police Department to the area, testified that demonstrations are allowed on the west side of First Avenue. Lieutenant Judge testified that the six specified locations on First Avenue were not the only sites where plaintiffs could perform Sankirtan: "[W]e did not say nowhere else [besides the six specified locations]. Actually, they could go any place they would wish and there would be no objection [except on the east side of First Avenue between 42nd and 48th Streets]." Defendants' Exhibit I confirms Lieutenant Judge's testimony by referring to the six locations as "recommended" and by reiterating the New York City Police Department policy of prohibiting picketing on the *east* side of First Avenue. While Defendants' Exhibit J does refer to a policy of prohibiting parades and demonstrations on First Avenue, this document is of little weight in light of the contrary testimony of Lieutenant Judge, the ambiguity of the reference, and the unreliable nature of the document. (Tr. 182–91). Thus, the court concludes that the New York City Police Department does permit plaintiffs to perform Sankirtan on the west side of First Avenue, and that plain-

tiffs are not restricted to the six specified locations.

Second, the policy described by defendants' counsel at the eleventh hour had not, until that time, been at issue in this action. Plaintiffs' complaint clearly seeks declaratory and injunctive relief with respect to the east side of First Avenue between 42nd and 48th Streets. Plaintiffs' motion for a preliminary injunction similarly sought relief with respect to the east side of First Avenue. At the preliminary injunction hearing, defendants' counsel eventually acknowledged: "[W]e do not have a policy where this whole area all in here is excluded from any public assemblies .... The six sites ... are not necessarily the only sites that would be allowed. The area that the Police Department is primarily concerned with is the east side of First Avenue directly in front of the United Nations fence and those areas on the west side of First Avenue by the United States Mission ...." In its December 4, 1980, opinion, the court carefully explained: "The narrow issue before this court is whether plaintiffs' constitutional rights are violated by a policy of the New York City Police Department which bars plaintiffs from proselytizing and soliciting funds in the immediate vicinity of the Visitors' Gate at the U.N. Headquarters." In their pre–trial memorandum, plaintiffs identified the single issue for trial: "Is the total ban of First Amendment activity on the East Side of First Avenue between 42nd Street and 48th Street constitutional as applied to Plaintiffs' concededly religious activity?" Defendants identified the issue even more narrowly in their pre–trial memorandum, identifying the relevant area as the east side of First Avenue between 45th and 46th Streets. Defendants can not now seek a ruling from the court on the constitutionality of a hypothetical policy prohibiting plaintiffs from performing Sankirtan on the west side of First Avenue.

Third, during the course of the preliminary injunction hearing and trial defendants' counsel made no attempt to introduce any evidence which would show a governmental interest in prohibiting plaintiffs from performing Sankirtan on the west side of First Avenue. While defendants introduced ample evidence which would justify its restriction in the vicinity of the Visitors' Gate and elsewhere on the east side of First Avenue, none of the evidence was addressed to the west side of First Avenue. In fact, none of the security reasons offered for the restriction on the east side of First Avenue would seem to be applicable to the west side of First Avenue. From the west side of First Avenue, even an athletic terrorist would have difficulty in leaping over the U.N. fence in a single bound or in hurling a bomb 130 feet across First Avenue, let alone the additional distance beyond the fence to U.N. buildings.

Finally, the restriction on the west side of First Avenue would appear to face grave constitutional objections, even under the relatively lax Second Circuit standard set forth in *Concerned Jewish Youth.* The evidence clearly demonstrates that the New York City Police Department allows demonstrations on the west side of First Avenue. To prohibit plaintiffs from performing Sankirtan on the very same sidewalks would seem to be directed at the content of their speech, an obvious violation of the First Amendment. Moreover, limiting plaintiffs' activities to the specified locations on the west side of First Avenue would seriously limit access to the audience of U.N. visitors. A restriction prohibiting one–to–one proselytizing and soliciting of funds on the west side of First Avenue would be difficult to justify as a reasonable means of protecting the U.N. Headquarters, and indeed, has not been justified by the record before the court in this action.

Accordingly, the court today holds only that plaintiffs' constitutional rights are not violated by a policy of the New York City Police Department which bars plaintiffs from proselytizing and soliciting funds on the sidewalks of New York City between 42nd and 48th Streets on the east side of First Avenue.

*Conclusion*

For the reasons stated above, the court concludes that plaintiffs' complaint must be dismissed.

So ordered.