**In the Matter of SURRENDER OF Elizaphan NTAKIRUTIMANA.**

**No. L–96–5.**

United States District Court,
S.D. Texas,
Laredo Division.

Dec. 17, 1997.

Donald DeGabrielle, Houston, TX, for Plaintiff.

Lazaro Garza–Gongora, Jr., Garza–Gongora & Gutierrez, Laredo, TX, Ramsey Clark, Lawrence (Larry) W Schilling, New York City, for Defendant.

### MEMORANDUM AND ORDER

NOTZON, United States Magistrate Judge.

Pending before the Court is a request by the United States (the Government) for this Court to authorize the surrender of ELIZA-PHAN NTAKIRUTINIANA (the Extraditee) to the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide or Other Such Violations Committed in the Territory of Neighboring States (the Tribunal). For the reasons stated below, the Court DENIES this request and ORDERS the immediate release of the Extraditee.

### FACTUAL BACKGROUND

The Extraditee is a 73 year old Rwandan citizen currently detained at the Webb County Law Enforcement Center. At the time of the events which form the basis of the charges against him, he was the President of the Seventh Day Adventist Church in Rwanda and was based in a church complex in Mugonero, Gishyita Commune, Kibuye Prefecture, Rwanda.[1] He is charged with luring several ethnic Tutsis to his church complex in the days immediately following the death of Rwandan President Habyarimana on April 6, 1994, and then organizing and leading an attack on his church complex on April 16, 1994, to kill all of these Tutsis. The Extraditee is an ethnic Hutu.[2] After the April 16, 1994 attack, the Extraditee is accused of leading armed bands of men into the countryside of the Bisesero region of Rwanda in an effort to hunt down and kill those Tutsis who survived the attack at Mugonero.[3] At some point after the attack on the Mugonero compound, the Extraditee was admitted to the United States and was legally residing with his son in Laredo, Texas, when he was arrested pursuant to these proceedings.[4]

On September 26, 1996, the Extraditee was provisionally arrested on the above charges. The Government timely submitted the packet containing the charges against the Extraditee, the official request for surrender from the tribunal and the documents intended to support that request on October 18, 1996. The instant request for surrender was made in the Government's "Motion for Hearing on Request for the Surrender of Elizaphan Ntakirutimana," filed on January 9, 1997 (Docket No. 19).

Since the filing of the request, the parties have submitted copious filings in this matter both on their own initiative and in response to directives from the Court. The Court has reviewed all of these filings, as well as all *amicus curiae*, prior to issuing this Memorandum and Order.

---

1. A Prefecture is roughly equivalent to a State within the United States, and a Commune is roughly equivalent to a county within a state.

2. For many hundreds of years there has been ethnic fighting between Tutsis and Hutus in Rwanda. The Hutus are the ethnic majority in Rwanda and comprised 84% of the population in 1994. At that time Tutsis comprised 14% of the population of Rwanda. Historically, Tutsis have held disproportionate levels of wealth and political power in Rwanda dating back to British Imperialist days and beyond.

3. The Bisesero region is a mountainous region of Rwanda that spans two communes.

4. The record is unclear as to when the Extraditee arrived in the United States. The Government contends that he remained in Rwanda in the months following the Mugonero attack and led the attacks in the Bisesero region. The Extraditee contends that he fled the Mugonero compound on the morning of April 16, 1994, and did not return to the area. What is undisputed is that at some point the Extraditee was admitted to the United States and was residing here legally when he was arrested

## DISCUSSION

◼ In matters of extradition, the Court must determine 1) whether the Court has jurisdiction to determine whether the fugitive is subject to surrender, and whether the Court has proper jurisdiction over the fugitive, 2) whether the fugitive is being sought for offenses which the applicable agreement permits surrender, and 3) whether there is sufficient evidence to establish the fugitive has committed the offenses for which he is being charged. *See Bingham v. Bradley,* 241 U.S. 511, 516–517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916); *McNamara v. Henkel,* 226 U.S. 520, 523, 33 S.Ct. 146, 147, 57 L.Ed. 330 (1913); *Ornelas v. Ruiz,* 161 U.S. 502, 508–509, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896); *Austin v. Healey,* 5 F.3d 598, 600–01 (2nd Cir.1993), *cert. denied,* 510 U.S. 1165, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994); *Garcia–Guillern v. United States,* 450 F.2d 1189, 1191 (5th Cir., 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *Sayne v. Shipley,* 418 F.2d 679, 683–84 (5th Cir., 1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970); *Zanazanian v. United States,* 729 F.2d 624, 625–626 (9th Cir.1984). As will be shown below, the instant request fails on the first and third prongs of the above inquiry.

### Jurisdiction:

The Government seeks the surrender of the Extraditee pursuant to the "Agreement on Surrender of Persons between the Government of the United States and the Tribunal" (Agreement) signed January 24, 1995, and the provisions of Section 1342 of Public Law 104–106. This section makes applicable to the instant case the procedures applicable to international extradition pursuant to 18 U.S.C. § 3184 *et seq.,* and the interpretative case law pertaining to those procedures. Accordingly, Congress has instructed the Court to treat the Agreement as if it were a treaty of extradition negotiated between the United States and some other sovereign country. After much careful consideration, the Court is of the opinion that Congress cannot so

instruct the Court and that Public Law 104–106, as it pertains to the Tribunal [5], is unconstitutional. Accordingly, the Court has no jurisdiction to hear the Government's requests and it will be DISMISSED.

On August 28, 1997, the Court invited the parties to comment on the authority of the Executive to negotiate treaties with parts of a multi-national body like the Tribunal and Congress' ability to effectuate such a treaty by enacting enabling legislation rather than adhering to a traditional ratification process by the Senate.

The Government cites the Court to four cases dealing with the United States–United Nations (U.N.) Headquarters Agreement for the proposition that the Executive has unlimited ability to make treaties and that courts have given effect to those agreements. *See Concerned Jewish Youth v. McGuire,* 621 F.2d 471 (2nd Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981); *United States v. Palestine Liberation Organization,* 695 F.Supp. 1456 (S.D.N.Y., 1988); *International Society for Krishna Consciousness, Inc. v. New York,* 501 F.Supp. 684 (S.D.N.Y., 1980); *Greenberg v. Murphy,* 329 F.Supp. 37 (S.D.N.Y.1971). While these cases support, silently, the Executive power to make international agreements, none of these cases addressed whether the Headquarters Agreement itself is constitutional. Rather they were all concerned with regulating other activities tangentially related to the Headquarters Agreement.

*McGuire* and *International Society for Krishna Consciousness,* deal with restrictions on First Amendment activity around the U.N. Both found the minor restrictions on First Amendment rights immediately around the U.N. were justified by the need for the United States to uphold international agreements. They did not pass on whether the Headquarters agreement was properly enacted. Additionally, *United States v. Palestine Liberation Organization,* which decided whether the Anti–Terrorism Act of 1988 authorized the closing of the PLO mission to

---

5. This same law authorized the surrender of persons to a similar U.N. tribunal investigating charges of genocide in the former Yugoslavia.

The Court expresses no opinion on the Constitutional efficacy of those provisions.

the U.N., recognizes that there is a difference between treaties and other international agreements. However that difference was not important to the decision of the court and was not addressed. *United States v. Palestine Liberation Organization, et al.,* 695 F.Supp. at 1458, n. 3 ("We refer to the Headquarters Agreement as a treaty, since we are not concerned here with making a distinction among different forms of international agreement. The applicable law implicates all forms, including the Headquarters Agreement.").

Moreover, the Headquarters agreement was enacted pursuant to a treaty ratified with Senatorial advice and consent. The preamble to the agreement states, "Whereas the Charter of the United Nations was signed on behalf of the United States on June 26, 1945, and was ratified on August 8, 1945, by the President of the United States, *by and with the advice and consent of the Senate,* and the instrument of ratification of the said Charter was deposited on August 8, 1945." Joint Res. Aug. 4, 1947, c. 482, 61 Stat. 756 (emphasis added). Clearly, the Headquarters Agreement was made to effectuate a validly negotiated, signed and ratified treaty entered into by the United States. This places it in marked contrast to the Agreement with the Tribunal in the instant case.

While the cases cited by the Government support the assertion that the Executive may have unlimited ability to make international agreements, these cases have no bearing on how Executive agreements are constitutionally implemented. Thus they are of little value in the instant context.

Of more value is the justification given by the Government for Congressional enactment. The Government cites the Court to *Grin v. Shine,* 187 U.S. 181, 191, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902) for the proposition that Congress may provide for the extradition of fugitives without treaty and without Executive action. The Court can find no support for this contention in the text of that case. Indeed *Grin v. Shine* involved an extradition of a fugitive to Russia, a country with which the United States had a valid extradition treaty. The wording seized upon by the Government ("Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient." *Grin v. Shine,* 187 U.S. at 191, 23 S.Ct. at 102.) pertains to the question of whether Congress could require more or less stringent proofs for surrendering a fugitive than those expressly contained in the treaty between Russia and the United States. It was not a statement by the Court that Congress can make extradition policy of its own accord. Indeed the entire *res* of the *Shine* case dealt with the application of provisions of a valid treaty between the United States and Russia. For the Government to claim that this case supports Congressional action in the field of extradition without a valid treaty is inapposite at best.

■ The Government also refers the Court to the provisions of 18 U.S.C. 3181(b) (1996) for the proposition that fugitives may be extradited without treaty. Section 3181(b) allows, "the surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition with such foreign government if the Attorney General certifies," certain specific facts. 18 U.S.C. 3181(b). However, despite this broad language, every case construing this section has required that a valid treaty exists between the United States and the country seeking extradition. *See Ivancevic v. Artukovic,* 211 F.2d 565 (9th Cir., 1954), *cert. denied* 348 U.S. 818, 75 S.Ct. 28, 99 L.Ed. 645, *reh'g. denied* 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698. (Extradition from the United States to a foreign country may be accomplished only during existence of any treaty of extradition with such foreign government.); *U.S. ex rel. Saroop v. Garcia,* 109 F.3d 165 (3rd Cir.1997)(extradition treaty existed based on conduct between Trinidad and Tobago and the United States); *Kin–Hong v. United States,* 926 F.Supp. 1180 (D.Mass. 1996), *supplemented by* 927 F.Supp. 517, *reversed on other grounds,* 83 F.3d 523 (1st

1042

Cir.1996)(Hong Kong's reversion to People's Republic of China (PRC) on July 1, 1997, will extinguish United States' authority to extradite individuals to Hong Kong). It is clear from these cases that, contrary to the Governments position, Congress has no independent authority to regulate extradition and that a treaty of extradition is required before extradition can occur.

For his part, the Extraditee claims, without citation, that there has never been an extradition from the United States that was not based on a treaty. While the Extraditee has not cited any authority for this assertion, the Court has found no instance where an extradition has occurred without a treaty. In none of the cases cited by either side in this dispute has there been an occasion where a fugitive was extradited absent a valid treaty. This fact convinces the Court that this is more than a mere matter of statistics.

■ The Constitution calls for the Executive to make treaties with the advice and consent of the Senate. Throughout the history of this Republic, every extradition from the United States has been accomplished under the terms of a valid treaty of extradition. In the instant case, it is undisputed that no treaty exists between the United States and the Tribunal. This is so even when, the Government insists, and the Court agrees, the Executive has the full ability and right to negotiate such a treaty. The absence of a treaty is a fatal defect in the Government's request that the Extraditee be surrendered. Without a treaty, this Court has no jurisdiction to act, and Congress' attempt to effectuate the Agreement in the absence of a treaty is an unconstitutional exercise of power. Accordingly, the Court FINDS that the provisions of Section 1342 of Public Law 104–106 are unconstitutional as they are applied to the Tribunal, and the Court DISMISSES the Government's request.

*Probable Cause:*

Assuming *arguendo* that Section 1342 of Public Law 104–106 is constitutional, the Court will proceed to an examination of whether there is probable cause to support the extradition of the Extraditee. The Court recognizes that the crimes of which the Extraditee is accused are crimes that are enumerated in the Agreement as supporting surrender. Thus the second prong of the Court's inquiry would be satisfied. The same cannot be said for the third prong.

■ The standard to be utilized in determining whether a fugitive is to be surrendered on the strength of the documents submitted by the requesting body is that of probable cause. *Escobedo v. United States,* 623 F.2d 1098, 1102 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497, *reh'g. denied,* 451 U.S. 934, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1980); *Garcia–Guillern v. United States,* 450 F.2d at 1192; *Jimenez v. Aristeguieta,* 311 F.2d 547, 562 (5th Cir. 1962). In making this determination, the Court is free to exercise its discretion in judging the credibility of the evidence presented as in any other domestic case where the Court would be required to make a determination of probable cause. *Parretti v. United States,* 112 F.3d 1363 (9th Cir.1997). However, the Court is not allowed to hear live testimony from witnesses, allow discovery, or to consider evidence submitted by the fugitive that would contradict the evidence presented by the Government. *See e.g., Hooker v. Klein,* 573 F.2d 1360 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327; *Collins v. Loisel,* 259 U.S. at 316, 42 S.Ct. at 472; *Jimenez v. Aristeguieta,* 311 F.2d at 556. Following these principles, the Court FINDS that the Government has not carried its burden.

■ The support for the charges against the Extraditee comes from an affidavit filed by a Belgian police officer assigned to the Tribunal, ARJEN MOSTERT. Officer Mostert has provided a 25 page affidavit which lays out the evidence against the Extraditee. The first eleven pages of his affidavit set out the history behind the creation of the Tribunal and recount, in a general way, the events that happened after the death of President Habyarimana in April of 1994.

When Officer Mostert finally begins his review of the attacks in which the Extraditee has been charged he offers a brief paragraph stating that the witnesses have not been

offered any monetary reimbursement or other consideration for their testimony. None of the witnesses are identified, other than by a letter (i.e.A, B, C, etc.), and there is no other identifying information other than a general description that all witnesses are "ordinary civilians."

Officer Mostert states that twelve survivors of the attacks on Mugonero and Bisesero were interviewed, witnesses lettered A–L. There is no statement that these witnesses have given reliable information in the past, or that Officer Mostert in his experience finds them to be reliable. Officer Mostert admits that he did not interview all, or even a majority, of the witnesses, and that their testimony is, at times, taken from reports of other officers which he reviewed. There is no indication that either Officer Mostert, or the other officers who conducted the interviews, were fluent in Kinyarwanda, the language of Rwanda. There is also no indication that the witnesses were fluent in any language spoken by the interviewers.

Officer Mostert does not state when these interviews were conducted in relation to the attacks. It is clear that at least one witness (Witness I) was interviewed on multiple occasions. It is not clear under what circumstances these interviews were conducted. Additionally, the affidavit fails to state when the charges against the Extraditee were first lodged (i.e. whether they were immediately lodged or whether they emerged over a period of time). Finally, there is not even any indication that these witnesses were placed under oath prior to making their statements.

Officer Mostert claims that four of the twelve witnesses (witnesses A, B, C and H) identified a picture of the Extraditee as a person who "participated in the attack." However, the affidavit fails to state when and under what conditions this photograph was shown to the witnesses, or whether the photograph was shown in conjunction with other photographs.

All of the above factors convince the Court that the possibility for inaccuracy or incredibility in the witnesses' statements is high. For that reason, the specific allegations against the Extraditee will be examined in light of the above factors.

Of the twelve witnesses only two claim that they observed the Extraditee during the attacks. All of the pertinent testimony will be discussed below. The Court will begin with the Mugonero attack.

Witness H states that he saw the Extraditee in the days immediately before the attack meeting with some of those who carried the attack out. He then states that once the attack began he saw the Extraditee, along with three others, armed with guns shoot at a group of Tutsis and that some of these Tutsis died. *See* Affidavit of Arjen Mostert at P. 18–19 ¶ 38. Taking this statement as true, the Court notes that Witness H does not state how he knew the group into which the Extraditee shot was composed of Tutsis. He does not state whether the group was armed nor does he state where in the complex this shooting took place. He does not say how long after the conflict began, which lasted all day, this shooting took place. This one sentence statement by Witness H is the only reference in the 25 pages of the affidavit wherein the Extraditee is accused of actually taking part in the attack at the Mugonero complex. None of the other witnesses can say that the Extraditee participated in the attack during that day. The most any other witness says is Witness I's statement that the Extraditee was "among the attackers." *See* Affidavit of Arjen Mostert at p. 20 ¶ 40.

There is no mention by any witness that the Extraditee committed a specific act, killed a friend or loved one, instructed others to kill or injure a friend or loved one, directed the assault or participated in any way other than the vague reference that he was "among the attackers." When examined in light of the factors mentioned above, such evidence is insufficient to convince the Court that probable cause exists to believe that the Extraditee participated in the attack on the Mugonero complex.

The same result is reached regarding the Government's allegations regarding the Bisesero attacks. Only Witness I claims to have seen the Extraditee kill or direct the killing of anyone in the Bisesero region. Witness I claims that he saw the Extraditee shooting at civilian Tutsis. *See* Affidavit of Arjen Mos-

tert at p. 23–24, ¶ 48. Interestingly, Witness I does not make this claim until what is apparently his third interview on the matter. *Id.* In an earlier interview, Witness I merely claimed, once again, that the Extraditee was "among the attackers" in the Bisesero region. *Id.*

Witnesses C and H claim they saw the Extraditee instruct other armed Hutus to take the roof off of a church so that it could not be used as a shelter. However, such an action would not constitute genocide as charged in the indictment [6]  .

Once again, the affidavit cannot support the conclusion that the Extraditee participated in the Bisesero attacks. It is remarkable more for what it does not say than what it does say. The only allegation of attacks comes from one witness who did not remember until his third interview that the Extraditee had participated in attacks. When this witness did remember that fact, he provided no detail as to where these attacks occurred and who, if anybody, was killed. Additionally, he gave no specifics as to the time these shootings occurred. As with the rest of Officer Mostert's affidavit, Witness I spoke in generalities and gave no specific facts that would support the surrender of the Extraditee.

After careful consideration of the affidavit submitted by the Government, the Court FINDS that the information contained therein does not rise to the level of probable cause. Accordingly, the Government's request for surrender is DENIED.

### CONCLUSION

In light of the findings made above, it is hereby ORDERED that the Government's request that ELIZAPHAN NTAKIRUTI-

MANA be surrendered to the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide or Other Such Violations Committed in the Territory of Neighboring States is DENIED. Additionally, the U.S. Marshal's Service is DIRECTED to, forthwith, release ELIZAPHAN NTAKIRUTIMANA from custody in accordance with the findings contained in this Memorandum and Order.

IT IS SO ORDERED.

**6.** Genocide is defined by the Tribunal in U.N. security counsel Resolution 955, Article 2, Paragraph 2 as:

"[a]ny of the following acts committed with the intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

(a) Killing members of the group;  .

(b) Causing serious bodily or mental harm to members of the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures intended to prevent births within the group;

(e) Forcibly transferring children of the group to another group."

The only conceivably applicable section to the allegation that the Extraditee ordered that a roof be taken off of a church is (c). The Court cannot say in good conscience that, assuming as the Court must that the event occurred, taking the roof off of one church is inflicting conditions on the Tutsis calculated to bring about their physical destruction.