**In the Matter of the EXTRADITION OF Ricardo GONZALEZ, Victor Huerta.**

**No. 99–06.**

United States District Court, W.D. Louisiana, Lafayette–Opelousas Division.

April 6, 1999.

Joseph Thomas Mickel, U.S. Atty's Office, Lafayette, LA, for U.S.

Wayne J Blanchard, Federal Public Defenders Office, Lafayette, LA, for defendants.

Wayne J Blanchard, (See above), for Ricardo Gonzalez, defendant.

## MEMORANDUM RULING ON APPLICATIONS FOR BOND IN EXTRADITION MATTER

METHVIN, United States Magistrate Judge.

Ricardo Gonzalez and Victor Huerta ("movers") were taken into federal custody on March 5, 1999 pursuant to a warrant and complaint for provisional arrest pending extradition to Mexico. Before the court are movers' applications for release on bond pending the extradition hearing. The United States government, on behalf of the government of Mexico ("the government"), opposes the applications for bond.

The undersigned magistrate judge held evidentiary hearings on March 17 and March 23, 1999. Considering the evidence presented and the applicable law, the undersigned concluded that movers established by clear and convincing evidence that special circumstances exist which entitle them to bond pending the extradition hearing, and that they are not flight risks. Specifically, movers demonstrated that they have a substantial likelihood of success on the merits at the extradition hearing because it appears the government will be unable to establish probable cause that movers are the bank robbers wanted in the extradition proceeding.

Accordingly, movers were released on March 23, 1999 on $100,000 unsecured bonds and stringent conditions of release. After consultation with the district judge, the government's motion for stay of the bonds pending appeal of this ruling was denied, except that the additional condition of electronic monitoring was added as a condition of release pending the resolution of any appeal of this order.

Set forth below are the findings of fact and conclusions of law supporting movers' release pending the extradition hearing.

## BACKGROUND

On the morning of June 30, 1998, three armed men robbed a bank in Puebla, Mexico, a city located approximately 80 miles southeast of Mexico City. According to documents received from Mexico, the perpetrators tied up and beat three security guards, threatening to kill them if they did not comply with their orders.[1] An unspecified number of bank employees were also tied up and threatened. The perpetrators seized approximately $13,500 in cash and $24,000 in travelers checks from the bank safe.[2] The two vehicles allegedly used in the robbery were found abandoned. It was later determined the vehicles had been stolen in Mexico.

Six months later, on December 30, 1998, Huerta and Gonzalez were arrested by city police in Lafayette, Louisiana while attempting to cash one of the stolen travelers checks at a Bank One branch. Movers were held for over two months in state custody, unable to make bond, until transferred to federal custody on March 5, 1998 pursuant to the United States' complaint for provisional arrest pending extradition.[3]

On March 12 and March 22 respectively, Huerta and Gonzalez filed the instant ap-

---

**1.** Letter from Ambassador Jesus F. Reyes Heroles to Secretary of State Madeleine Albright dated February 25, 1999, admitted into evidence at the March 17 evidentiary hearing as **Exhibit G2;** *see* p. 2 of the English translation.

**2.** Id. A total of 127,617.62 Mexican pesos were stolen, equivalent to $13,285 as of the

date of this ruling, along with $292 in foreign currency. A total of 240 travelers checks in $100 denominations were also taken, a total value of $24,000.

**3.** Huerta's bond was set at $50,000 and Gonzalez' bond was set at $100,000; however,

plications for bond. Movers contend that special circumstances warrant their release on bond: specifically, that they are innocent and can prove that on the day of the robbery they were at their jobs hundreds of miles away from Puebla. Furthermore, both contend that they are not flight risks and can be released on bond pending the extradition hearing.

The government contends that the court erred in admitting alibi evidence at the bail hearing because such evidence is inadmissible at an extradition hearing. The government also contends that movers have failed to show special circumstances for their release, particularly if the court excludes the alibi evidence.

## FINDINGS AND CONCLUSIONS
### I. Findings of Fact

■ The government, with rare exception, chose not to cross-examine movers' witnesses at the evidentiary hearings, nor did the government call any witnesses.[4] The government also raised no challenge to the factual information presented to the court by Pretrial Services regarding the backgrounds of Huerta and Gonzalez. Therefore, the facts presented to the court are largely uncontested.

### A. Victor Huerta

Victor Huerta was born in Mexico and is twenty-six years old.[5] He legally entered the United States at age seventeen on December 17, 1989, and has lived and worked here since then. Huerta's immi-

gration attorney, Marvio G. Thompson of Metairie, Louisiana, has been assisting him since June 1996 in obtaining permanent resident status.[6] Through his attorney's efforts, Huerta has applied for certification for alien employment through the U.S. Department of Labor, and Huerta's employer has filed the necessary petition with the Immigration and Naturalization Service (INS). The parties stipulated at the March 17 hearing that Huerta is legally in the United States.[7]

Huerta resides in Abbeville, Louisiana. He has one sister also living in Abbeville, Cristina Serrano. Huerta's parents, a brother, and three other sisters reside in Mexico. One of the sisters in Mexico is married to mover Ricardo Gonzalez. Huerta obtained a high school diploma in Mexico, and is currently working on his GED in Erath, Louisiana. In 1998, Huerta worked for Larry Romero at his rooster farm in Abbeville, earning between $1200 and $1500 per month. He also worked for a month and a half as an offshore laborer and for three months as a truck driver for Randol's Restaurant in Lafayette. Huerta married Jacqueline Juarez in August 1997, but they separated in September 1997. He has no criminal history other than the arrest in connection with the instant matter.[8]

Documentary evidence shows that during the relevant period, Huerta worked, maintained bank accounts, had an established credit record, paid bills, and essentially lived a normal life.[9] In June 1998,

neither mover could post the necessary security.

4. The government is not obliged to call witnesses at an extradition hearing, or at a bail hearing pending extradition, and may rest its case entirely on written documentation. As discussed *infra,* the government relies solely on an affidavit stating that three eyewitnesses had identified movers from faxed photographs sent from Lafayette, La. The government objected to the court receiving evidence of movers' "alibi defense," or any other evidence which was "contradictory" in nature. A discussion of these legal issues is contained at pp. 738–40 *infra.*

5. Pretrial Services Report dated March 16, 1999 on Victor Huerta.

6. Letter from attorney Marvio G. Thompson dated March 16, 1999, **Exhibit D8** admitted at the March 17 hearing.

7. Minutes of Court from bond hearing held March 17, 1999, ¶ 2.

8. Pretrial Services Report.

9. See Exhibits **D1–D7** introduced at the March 17 hearing.

Huerta had two local checking accounts: a joint account with Juarez at Gulf Coast Bank in Abbeville, and an individual checking account at First National Bank in Lafayette.[10] Bank statements during this period, show modest (sometimes negative) balances.

Huerta testified that he has not traveled to Mexico, or any other country, since his entry into the United States in December 1989. This testimony is corroborated by Huerta's immigration attorney, who stated in a letter:

It is the customary practice of this firm to advise all clients in the process of obtaining permanent residence not to travel outside of the United States without consulting this office first. In many cases, departing the United States may be considered an abandonment of the process. Although our office does not have a record of advising Mr. Huerta of the risks of departing the United States, we believe that he was advised not to leave while his application was pending. Further, Mr. Huerta never contacted this office about departing the United States, or to advise that he had in fact departed and returned.

(Exhibit D8 admitted at the March 17 hearing).

Huerta's sister, Cristina Serrano, testified regarding Huerta's whereabouts on June 30, 1998. Serrano has been legally in the United States for eleven years. According to Serrano, on the date in question, Huerta worked at Larry Romero's rooster farm during the day. She is 75% sure that in the evening, Huerta babysat her children while she and her husband went to a casino. Serrano explained that during that period, she and many other Mexicans were closely following Mexico's progress in the World Cup soccer tournaments. The games were being broadcast live via satellite in the mornings, and the replays were aired at night. She believes that on the night of June 30, her brother

wanted to watch the replays at her home, and. that he babysat at the same time.

Huerta also testified that he believed he was watching a soccer game replay on the night of June 30—specifically Mexico's game against Holland which resulted in a 2–2 tie. Following the March 17 hearing, however, the undersigned checked the World Cup schedule for June 1998 via the Internet. The information obtained showed that the Holland–Mexico game was played on June 25, 1998. There is no record of a match being played on June 30, 1998. To allow Huerta to address this discrepancy, among other things, another hearing was held on March 23.[11] No additional evidence was presented on this point. However, persuasive evidence of Huerta's whereabouts was presented at the March 23 hearing by Huerta's employer, Larry Romero.

Romero lives in Abbeville, Louisiana. After his retirement from Trans La Gas in December 1997, he began raising game roosters for worldwide shipment. In addition, he trains roosters for cockfighting derbies. Romero hired Huerta to help him train the roosters and to perform other jobs around the farm. Huerta has permission from INS to work for Romero. In June 1998, Huerta was both living and working at Romero's farm, and was Romero's only full-time employee. Romero has known Huerta for ten years, since shortly after he came to the United States.

Romero testified that he specifically recalls Huerta being at work on June 30 because Romero had committed to send roosters to a derby to be held in Texoma, Oklahoma on July 2, 3 and 4, 1998. Romero and Huerta spent each day leading up to the derby training the roosters together. Romero corroborated this testimony by showing the court page 80 of "Game Cock" magazine which contained a reference to the derby being held on the dates in question. Romero testified that he would have remembered if Huerta was

10. **Exhibits D4 and D6** introduced at the March 17 hearing.

11. Order Setting Supplemental Bond Hearing signed March 19, 1999, Rec.Doc. _____.

absent two days before the Oklahoma derby, and that he was not absent. Romero characterized Huerta as one of the most dependable workers he has ever known. He is certain that Huerta was working with him on the farm on June 30, 1998. The undersigned found Romero to be a credible witness.

Other witnesses testified to Huerta's whereabouts in the days prior to and following June 30, 1998. In assessing this testimony, it is important to understand the geographic distance between Abbeville, La. and Puebla, Mexico. The undersigned takes judicial notice that the driving distance between Huerta's home in Abbeville and Puebla, Mexico is approximately 1240 miles.[12] At sixty miles per hour, without any stops, the driving time would be in excess of 20 hours.

Kenneth Morrison testified he has known Huerta since 1993. Morrison's wife is from Tampico, Mexico. The Morrisons and Huerta attend a Spanish Mass held each Sunday. Huerta drives to Erath to pick up other Spanish-speaking people for the mass. Morrison testified that he saw Huerta at the Mass on Sunday, June 28, 1998 two—days before the bank robbery in Puebla, Mexico.

Ruben Blancas testified that he has known Huerta for six years. Blancas is a self-employed electrical engineer. He was born in Mexico but has been a U.S. citizen since 1965. Blancas met Huerta through the Spanish Cursillo Center, a religious organization located in Opelousas, La. Blancas testified that Huerta was present at a Cursillo meeting on July 2, 1998 (two days after the robbery in Puebla, Mexico). This testimony is corroborated by a news-

letter sent out by the Prairie Ronde Cursillo Center on July 6, 1998, introduced as Exhibit D11 at the March 17 hearing.

Reverend Juan Alers, a Catholic priest born in Puerto Rico, testified that he has known Huerta since 1994 or 1995. Alers is currently assigned to the Phelps Correctional Center at DeQuincy, Louisiana. He is also the former director of the Spanish ministry and the Cursillo movement in the south Louisiana region. Alers testified that he is Huerta's spiritual counselor. He knows Huerta well and is certain that Huerta is incapable of robbing a bank. Alers testified he would have known if Huerta had left the country for a trip to Mexico in June or July 1998, and that he has never known Huerta to travel. He also testified that the trip from Lafayette to the Mexican border at Matamoras is a twelve-hour drive, and that the drive from Matamoras to Puebla would be many more hours. Alers is sure that it would have come to his attention if Huerta had been absent for the time necessary to travel to and from Puebla, Mexico.

Maurice Bares testified that he has known Huerta for ten years. Bares' wife is from Mexico and she is also a friend of Huerta. He knows Huerta through the church. He has never known Huerta to be in any trouble.

### B. Ricardo Gonzalez

Gonzalez is 41 years old and a citizen of Mexico. He is married to Huerta's sister Pilar. The couple live in Guadalupe, Mexico with their five children, ages two to seventeen.[13] Guadalupe is near Monterrey and is roughly 662 miles from Puebla, where the robbery took place.[14] For the

---

**12.** Mileage computed by MapQuest (http://www.mapquest.com) as shortest driving distance between Abbeville, La. and Puebla, Mexico. Judicial notice can be taken of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b)(2) Fed.R.Ev. While it is possible MapQuest's exact computation might be questioned, the government concedes that there is a great distance between Abbeville and Puebla, and the mileage is not seriously disputed.

**13.** Testimony of Ricardo Gonzalez at the March 23, 1999 hearing.

**14.** Letter to the Federal Public Defender from Spanish interpreter/investigator Harcourt M. Stebbins, relaying the substance of a telephone conversation he had on March 16, 1999 with David Cabrera MacGregor, Gonzalez' employer in Guadalupe, Mexico, admitted as **Exhibit D10** at the March 23 hearing.

past three years, Gonzalez has been employed by Express Cama, a transportation company. Gonzalez is the chief of maintenance. His responsibilities include keeping the various trucks in running condition and ordering necessary parts for repairs.[15] Gonzalez is a salaried worker and earns 9,000 pesos per month (approximately $943.00).[16] Gonzalez has no criminal record other than his arrest in connection with the instant matter.[17]

Gonzalez' supervisor, David Cabrera MacGregor, spoke with investigators for the Federal Public Defender's Office regarding Gonzalez's character, work record, and most importantly, his whereabouts on June 30, 1998. MacGregor stated that on June 30, Gonzalez reported to work as usual, ate lunch on the premises, and left work at 6:00 p.m. or shortly thereafter.[18] MacGregor's statements are corroborated by the company's bi-weekly pay stubs dated June 15, June 30, and July 15, 1998. The stubs show that Gonzalez received 3,824 pesos for each 2–week period, and that no time off was taken.[19]

## C. Circumstances Surrounding the Possession of the Stolen Travelers Checks

There is no dispute that Gonzalez came to the United States in possession of some of the travelers checks stolen in the June 30, 1998 bank robbery in Puebla, Mexico. The circumstances surrounding this issue were fully aired at the March 23, 1999 evidentiary hearing.

Gonzalez testified that he and his family had planned a trip to visit his wife's brother (Huerta) and sister (Serrano) in Abbeville, Louisiana over the 1998 Christmas holidays. Gonzalez testified that on December 23 around 8:00 p.m., before he crossed the Laredo bridge into the United States, he stopped at an "exchange business" to obtain American dollars for his trip. As he was waiting, he was approached by another Mexican male who stated he was coming from Laredo and had U.S. dollars which he wanted to exchange for pesos. The man asked Gonzalez how much currency he wanted, and Gonzalez replied that he wanted $2000 in U.S. dollars. The man then walked over to a pickup truck in which a woman and two children were waiting. Gonzalez assumed this was the man's family. The woman handed the man a case. After counting the money in the case, the man told Gonzalez he had $800 in cash, but could give him the rest in travelers checks. The man assured Gonzalez the checks were just like cash and required only Gonzalez's signature. Gonzalez had never purchased or used travelers checks before, but he was aware that they were for travelers and that they were safe. Gonzalez agreed to the exchange and crossed the border into the United States.[20] Gonzalez testified he didn't suspect anything because the man was well-dressed, had his family in the pickup with him, and seemed to be a "nice family man."

Gonzalez did not use the travelers checks until the day he attempted to exchange them at Huerta's bank on Decem-

---

15. Results of telephone interview with David Cabrera MacGregor on March 19, 1999 by Harcourt M. Stebbins, **Exhibit D3** introduced at the March 23 hearing.

16. Id. Gonzalez testified at the March 23 hearing that he makes approximately $800 per month, which appears to be a net number. (Currency conversion performed on March 25, 1999 via the "Full Currency Converter" web page, http://www.xe.net/currency/full/).

17. Pretrial Services Report dated March 23, 1999.

18. **Exhibit D10** admitted at the March 17, 1999 hearing.

19. **Exhibit D5** admitted at the March 23, 1999 hearing.

20. Gonzalez entered the United States on a valid visa, and the government stipulated that Gonzalez is legally in the United States. *See* Minutes of Court from bond hearing held March 17, 1999, ¶ 2.

ber 30. According to the evidence presented, Huerta and Gonzalez went to a Bank One branch in the Broadmoor area of Lafayette. They chose this bank because Huerta had a checking account there.[21] Both Gonzalez and Huerta went to the teller's window. Gonzalez showed the teller his passport as identification. Soon thereafter he and Huerta were arrested by Lafayette city police officers for being in possession of stolen goods.

To test his credibility, the court asked Gonzalez to give a detailed description of the man who gave him the travelers checks at the Laredo border. Gonzalez was able to do so in great detail, even remembering the type of jewelry he wore and that he combed his hair to the the right. Gonzalez was also able to describe the man's vehicle and the position of the occupants inside. The undersigned found Gonzalez to be a credible witness.

### D. Identification of Huerta and Gonzalez by the Victims

The government contends that three of the victims of the robbery have positively identified Huerta and Gonzalez as the perpetrators. The circumstances surrounding these identifications, however, are highly suspect. Absent a substantial and independent showing of reliability, the identifications would not meet the standards of probable cause under the Constitution and laws of the United States.

There is no dispute that six months passed between the robbery in Puebla and the arrest of movers in Lafayette. During this time, the Mexican government conducted an investigation. Excerpts from the letter from Ambassador Reyes Heroles to Secretary Albright state:

> The investigations conducted by the Attorney General of the state of Puebla

led to the confiscation of two vehicles, which were located abandoned in the vicinity of where the alleged acts of the accused took place. One of the confiscated vehicles was the green Stratus in which both of the accused arrived at bank. The car contained, among other things, bullets for a 38. special caliber gun. It was also determined that the green Stratus and the other automobile had been stolen in the Federal District, in the state of Mexico.

(Exhibit G2 introduced at the March 17 hearing, p. 2 of the English translation).

Logic would dictate that the investigation would also include obtaining descriptions of the perpetrators from the victims. However, at no time have any such descriptions been submitted to this court. In fact, the problem of identification was first raised by the undersigned magistrate judge in chambers on March 4, 1999 when Assistant U.S. Attorney Joseph Mickel first presented the "Complaint for Provisional Arrest With a View Towards Extradition." The undersigned noted that the alleged perpetrators of the robbery were described in the complaint using descriptions created by the Lafayette Police Department (LPD) *after* the arrest of Huerta and Gonzalez. More importantly, the original complaint contained no statement that the description created by the LPD matched any description given by the victims or any other source in Mexico. Following this exchange, AUSA Mickel amended the complaint, which was later filed into the record. The complaint as amended reads as follows:

> *** The description of GONZALEZ and HUERTA *provided by Mexican officials* matches that of two inmates at the Lafayette Parish correctional Center. That description is as follows:

Name: RICARDO GONZALEZ

---

21. As noted *supra,* Huerta had a checking account with First National Bank. The undersigned takes judicial notice of the fact that in the fall of 1998, due to regulatory decisions, all First National Bank accounts were transferred to either Bank One or New Iberia Bank.

| | |
|---|---|
| Nationality: | Mexican |
| Sex: | Male |
| Date of Birth: | November 20, 1957 |
| Age: | 41 years |
| Height: | 5 feet 6 inches (1.65 meters) |
| Weight: | 140 pounds (65 kilograms) |
| Hair: | Black |
| Eyes: | Brown |
| Location: | Lafayette Correctional Center |

| | |
|---|---|
| Name: | VICTOR HUERTA. LPCC mistyped his name in their database. They have him listed as Victor Heurta. |
| Nationality: | Mexican |
| Sex: | Male |
| Date of Birth: | July 28, 1972 |
| Age: | 26 years |
| Height: | 5 feet 8 inches (1.70 meters) |
| Weight: | 225 pounds (104 kilograms) |
| Hair: | Black |
| Eyes: | Brown |
| Location: | Lafayette Correctional Center |

---

(Complaint, Rec.Doc.1, pp. 2–3).

While the complaint thus implies that Mexico has provided a description of the perpetrators, this is not the case. The government concedes that the descriptions "provided by Mexican officials" are actually those created by the Lafayette police after movers were arrested. Rather than produce the description of the perpetrators contained in Mexico's investigative files, the government relies on the following circuitous argument: Mexico's description of the perpetrators "matches" that of the Lafayette City Police because three eyewitnesses have positively identified movers from photographs taken by the Lafayette Police Department. Since the Lafayette police created the descriptions at the same time as the photographs, then the descriptions must accurately describe the perpetrators. The specious logic of this position is evident. More disconcerting, however, is that the method employed in the identification process appears to have been highly suggestive and improper under United States jurisprudence.

Although the details of the identification process are unclear, the basic facts are not in dispute. Following movers' arrest, Lafayette police faxed copies of movers' photos and their descriptions to Mexico. On January 4, 1999, the faxed photos were shown to three of the eyewitnesses.[22] Each identified movers as the perpetrators. It does not appear that any other photos were shown to the eyewitnesses. The three identifications are recounted in a virtually identical fashion in the documents from Mexico. The account of Officer Romero's identification is typical, and reads as follows:

B) Ministerial Proceeding dated January 4, 1999 by means of which the photographs of two male subjects were placed before the sight of *Pedro Guevara Romero*, Policeman assigned for the security of the robbed branch and eyewitness of the facts, *who were detained in the City of Lafayette, Louisiana, United States of America when they were trying to cash several travelers checks that were reported as robbed in the City of Puebla, Puebla,*

---

**22.** The eyewitnesses were Police Officer Pedro Guevara Romero, Police Officer Daniel

Alejo Velarde, and bank employee Rocio Concepción Soto Garcia

*Mexico.* The said photographs were remitted through a fax machine by the Police Department of the already mentioned American City, and by means of which Pedro Guevara Romero recognized RICARDO GONZALEZ and VICTOR HUERTA as the persons who on June 30, 1998 broke into the branch office of the banking institution located in La Paz.[23]

(Emphasis supplied). This recitation suggests that at the time the faxed photos were presented to the eyewitnesses, suggestive information was also provided, such as the circumstances under which the subjects were arrested.

## II. Conclusions of Law

**A.** *Legal Standard for Bail in Extradition Proceedings—"Special Circumstances"*

Bail is not ordinarily available in extradition cases "due to the foreign relations interest of the United States in successfully returning persons subject to criminal prosecution to the requesting country." *In Re Extradition of Nacif–Borge,* 829 F.Supp. 1210, 1214 (D.Nev. 1993); *In Re Extradition of Russell,* 805 F.2d 1215, 1216 (5th Cir.1986). Since extradition cases are not criminal in nature, the provisions of the Bail Reform Act do not apply. *Kamrin v. United States,* 725 F.2d 1225, 1227–1228 (9th Cir.), *cert. denied,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984). The legal standards which govern release or detention of an extraditee are governed by federal case law. *In Re Extradition of Mainero,* 950 F.Supp. 290, 293 (S.D.Cal.1996).

In 1903, the Supreme Court established the standard for bail in extradition cases which courts attempt to apply today: bail is available only where "special circumstances" are shown. *Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903). The extraditee must establish the special circumstances by clear and con-

vincing evidence, and must also show that he will not flee or pose a danger to any other person or to the community. *Nacif–Borge,* 829 F.Supp. at 1215. Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition. *Extradition of Smyth,* 976 F.2d 1535, 1535–36 (9th Cir.1992). The lack of flight risk alone does not constitute sufficient "special circumstances." *See Salerno v. United States,* 878 F.2d at 318; *Matter of Extradition of Russell,* 805 F.2d 1215, 1217 (5th Cir.1986). Nonetheless, where an extraditee poses a risk of flight, courts have not granted bail. Thus, proof that defendant does not pose a risk of flight is a necessary, but not sufficient, showing for bail pending an extradition hearing.

Courts have found special circumstances in the following instances:

1. Where the extraditee raises substantial claims showing a high probability of success on the merits (*Nacif–Borge,* 829 F.Supp. at 1216; *Salerno v. United States,* 878 F.2d 317 (9th Cir.1989));

2. Where there is no suitable facility in which to detain a juvenile extraditee (*Hu Yau–Leung v. Soscia,* 649 F.2d 914 (2nd Cir.1981));

3. Where there has been or will be significant delay in the appeals process (*In Matter of Extradition of Kirby,* 106 F.3d 855, 863 (9th Cir. 1996); *In Re Extradition of Morales,* 906 F.Supp. 1368 (S.D.Cal. 1995); *United States v. Williams,* 611 F.2d 914, 915 (1st Cir.1979));

4. Where the petitioner might lose "all his fortune" if not permitted to complete his participation in a civil proceeding underway at the time of his arrest (*In re Mitchell,* 171 F. 289, 290 (S.D.N.Y.1909));

---

**23.** Affidavit of Federal Agent of the Public Prosecutor Flor de Maria Medina Hernandez, Mexico, Federal District, dated March 8, 1999, admitted as **Exhibit G3** at the March 17 hearing.

5. Where the detainee may suffer a serious health threat while detained (*United States v. Taitz*, 130 F.R.D. 442 (S.D.Cal.1990); *Salerno*, 878 at 317);

6. Where it is shown the requesting country would grant bail in a comparable extradition case (*In Re: Extradition of Nacif–Borge*, 829 F.Supp. 1210 (D.Nev.1993); *Taitz*, 130 F.R.D. at 447).[24]

■ The list of potential "special circumstances" is not limited to those previously recognized in published decisions. *Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir.1977). Moreover, the decision to grant bail and, consequently, the determination of what constitutes a "special circumstance," is left to the sound discretion of the trial judge. *Id.*

### B. The Probable Cause Standard in Extradition Proceedings

■ Movers contend they have a substantial likelihood of success on the merits at the extradition proceeding because the government will be unable to produce sufficient evidence to support their extradition. Such a showing may constitute special circumstances for bail. *See Nacif–Borge*, 829 F.Supp. at 1216; *In Matter of Extradition of Rouvier*, 839 F.Supp. 537, 539 (N.D.Ill.1993) (*citing Salerno*, 878 F.2d at 317).

■ In an extradition hearing, the government must show three things: (1) that there is a valid treaty between the nation requesting the extraditee and the nation holding the extraditee; (2) that the conduct charged is criminal in both jurisdictions and that it is an extraditable offense; and, (3) *that there is probable cause to find that the crime was committed and that the named extraditee committed the crime.* *United States v. Barr*, 619 F.Supp. 1068, 1070 (E.D.Pa.1985) (emphasis supplied). There is no dispute that the first two

elements have been established. It is the third element which movers contend is lacking in this case.

■ Article 3 of the treaty with Mexico specifies that the standard to be applied at the extradition hearing is that of the "requested" country—i.e. the United States:

### Evidence Required

Extradition shall be granted only if the evidence be found sufficient, *according to the laws of the requested Party*, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party.

The evidence required for extradition is again addressed in Article 10, ¶ 3:

3. In addition, when the request for extradition relates to a person who has not yet

been convicted,, it shall be accompanied by ***

b) Evidence which, *in accordance with the laws of the requested Party*, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there. (emphasis supplied)

Thus, the standard to be applied at the extradition hearing is that of probable cause as used in federal preliminary proceedings. *Sindona v. Grant*, 619 F.2d 167, 175 (2nd Cir.1980). Under this standard, the government must show evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C.Cir.1973); *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

---

24. *But see In re Extradition of Rouvier*, 839 F.Supp. 537 (N.D.Ill.1993), which held that availability of bail in the extraditing country was irrelevant and could not constitute special circumstances. *Also In Re Extradition of Siegmund*, 887 F.Supp. 1383, 1386 (D.Nev. 1995).

Movers may successfully defend extradition if they can show there is no probable cause to find that they committed the bank robbery charged by Mexico. *Barr*, 619 F.Supp. at 1071. Concomitantly, if movers show at the bail hearing a substantial likelihood of such an outcome, this may constitute special circumstances justifying bail pending the hearing.

### C. The Government's Case for Probable Cause

As discussed above, little reliable evidence has been proffered by the government to implicate movers in the robbery in Puebla, Mexico. The sole evidence submitted is an affidavit stating that three eyewitnesses identified movers from photos faxed to Mexico by the Lafayette Police Department. As discussed above, no evidence has been proffered to clearly establish the circumstances surrounding these identifications, but it appears that these were the only photographs shown to the witnesses. The affidavit also implies that the witnesses were told that the men in the photographs were found in possession of the stolen travelers checks, suggesting their guilt.

The government of Mexico has an affirmative obligation to properly identify persons being sought for extradition. Article 10 ¶2(e) of the Treaty requires the government to furnish "facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location." [25] So far, the government has failed to produce any description of the robbers resulting from its own investigation. The government's reliance upon identifications provided by the Lafayette Police Department is highly suspect under these circumstances.

Putting aside for a moment what the government has failed to produce, the court must examine what has been offered to establish probable cause and measure it against federal probable cause standards.

In this case, the government relies solely upon the eyewitness identifications.

The Fifth Amendment Due Process Clause prohibits identification testimony that derives from impermissibly suggestive procedures that may lead to an irreparably mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The showing of a single photograph is impermissibly suggestive, and absent a showing of reliability considering the totality of the circumstances, must be excluded as evidence. *U.S. v. Johnson*, 114 F.3d 435, 442 (4th Cir.) *cert. denied* —— U.S. ——, 118 S.Ct. 257, 139 L.Ed.2d 184 (1997); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) the Supreme Court expressed concerns not only about photographic identifications, but also cautioned against situations where there is only a single photo shown, and situations where police suggest that there is evidence linking the individual pictured with the crime. *Id.* at 383–84, 88 S.Ct. 967. It appears that the identification procedures used in the instant matter had all the earmarks of an unreliable and suggestive identification.

In assessing reliability, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the crime; (2) the witness' degree of attention at the time of the crime; (3) the accuracy of the witness' description of the defendant prior to the identification; (4) the witness' level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The third factor—*the accuracy of the witness' description of the defendant prior to the identification*—is particularly relevant here, since the government has failed

---

**25.** The Treaty was introduced as G1 at the March 17 evidentiary hearing.

to produce any information regarding the descriptions offered by the eyewitnesses following the robbery and prior to movers' arrests six months later.

In a recent case involving photographic identification of an extraditee, the court stated:

> . *** Officer Mostert claims that four of the twelve witnesses (witnesses A, B, C and H) identified a picture of the Extraditee as a person who "participated in the attack." *However, the affidavit fails to state when and under what conditions this photograph was shown to the witnesses, or whether the photograph was shown in conjunction with other photographs.* All of the above factors convince the Court that the possibility for inaccuracy or incredibility in the witnesses' statements is high.

*In the Matter of Surrender of Ntakirutimana,* 988 F.Supp. 1038, 1043 (S.D.Tex. 1997). The court in *Ntakirutimana* denied extradition on a finding that the affidavit submitted by the government was unreliable and did not rise to the level of probable cause. *Id.* at 1044.

█ Considering the facts presented in light of the applicable case law, I find the government has failed to establish the reliability of the identifications. Since no other evidence has been submitted by the government so far, and in light of the evidence produced by movers, I conclude that movers have a substantial likelihood of succeeding on the merits at the extradition hearing. At this point, the government has failed to produce evidence sufficient "to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973).

### D. *Propriety of Considering "Alibi" Evidence*

The government contends that the court improperly allowed movers to present evidence of an "alibi defense" at the bail hearing; that alibi evidence may only be presented as a defense at trial in Mexico; that if the alibi evidence is disregarded, the only factor supporting bail is the fact that movers are not flight risks; and that absence of flight risk alone cannot constitute a special circumstance. *Citing Salerno,* 878 F.2d at 318; *Matter of Extradition of Russell,* 805 F.2d at 1217.[26]

█ The government is correct that an extradition proceeding is not intended to adjudicate an accused's guilt or innocence. *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). The rules of evidence and criminal procedure do not apply. Fed.R.Evid. 1101(d)(3); Fed.R.Crim.P. 54(b)(5). The scope of the hearing is limited; the only evidence admissible is that which explains away or completely rebuts the existence of probable cause. *Sayne v. Shipley,* 418 F.2d 679, 685 (5th Cir.1969), *cert. denied* 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970). "If the evidence merely controverts the government's probable cause evidence, or raises a defense, then it is excluded." *In Matter of Extradition of Contreras,* 800 F.Supp. 1462, 1464 (S.D.Tex.1992); *Charlton v. Kelly,* 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Sayne v. Shipley,* 418 F.2d 679, 685 (evidence of insanity inadmissible); *Desmond v. Eggers,* 18 F.2d 503, 506 (9th Cir.1927) (alibi or other evidence contradicting proof of probable cause inadmissible). The admission and evaluation of evidence in extradition proceedings is committed to the sound discretion of the court. *Id.; Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922).

Courts have struggled to clarify the distinction between admissible "explanatory" evidence and inadmissible "contradictory" evidence. In *Sindona,* the district court stated:

> The distinction between "contradictory evidence" and "explanatory evidence" is

**26.** *See* Memorandum of Law in Opposition to Bail, Rec.Doc. ____, p. 8–10.

difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting "explanatory evidence," *the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.* The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

*In Re Sindona,* 450 F.Supp. 672, 685 (S.D.N.Y.1978) (emphasis supplied).

 Evidence of an alibi defense is therefore admissible if it negates or obliterates probable cause, but not if it merely controverts the evidence of the requesting country. *Contreras,* 800 F.Supp. at 1469; *Maguna–Celaya v. Haro,* 19 F.Supp.2d 1337 (S.D.Fla.1998).

The undersigned has undertaken an exhaustive review of the case law involving alibi evidence at extradition hearings. Most of the language which refers to the inadmissibility of alibi evidence is dicta, as relatively few cases have actually involved alibi defenses. In the following cases, alibi evidence was presented and considered: *Correll v. Stewart,* 1991 WL 157246 (6th Cir.1991) (the court considered alibi evidence—later retracted—along with other evidence and concluded that probable cause for extradition was established); *U.S. v. Wiebe,* 733 F.2d 549, 553 (8th Cir. 1984) (the magistrate judge was "quite generous" in permitting Wiebe to testify; he denied any culpability or involvement; however Wiebe had fled Spain after a warrant was issued there and the court found probable cause to extradite);

In the following cases, alibi evidence was offered but either not admitted or excluded after admission. These cases are distinguishable in that they each involve substantial probable cause evidence, unlike the instant case. *See Eain v. Wilkes,* 641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (petitioner offered evidence that he was elsewhere on the day of the bombing in question; however, the evidence from the requesting country was strong and included a detailed statement by an accomplice; furthermore, petitioner had evaded arrest and given a false name to FBI agents); *Hooker v. Klein,* 573 F.2d 1360 (9th Cir. 1978) (magistrate judge denied extradition after hearing rebuttal evidence by extraditee and concluding that no crime had been committed in Canada. A second extradition request was filed in which a district judge reviewed the record before the magistrate judge, and ordered extradition on a finding that the rebuttal evidence had been improperly admitted. Again, it appears there was strong probable cause evidence submitted on the part of the requesting country); *Desmond v. Eggers,* 18 F.2d 503, 505 (9th Cir.1927) (the court upheld the magistrate judge's exclusion of alibi testimony on the basis that it was merely a "defense to a trial on the merits"); *In Re Extradition of Okeke,* 1996 WL 622213 (D.N.J.1996) (the court admitted a proffer of alibi evidence, including testimony of Okeke's employer; however, there was strong evidence from a cooperating individual that Okeke was involved in drug trafficking in France during that period. The court excluded the alibi evidence from consideration); *In re Wadge,* 15 F. 864 (S.D.N.Y.1883) (the court refused to allow the extraditee additional time to gather alibi depositions from England, the requesting country).

There are two cases which are substantially on point with the instant matter: *Maguna–Celaya v. Haro,* 19 F.Supp.2d 1337 (S.D.Fla.1998) and *In Matter of Extradition of Contreras,* 800 F.Supp. 1462 (S.D.Tex.1992). In both cases, the government sought extradition based solely on statements implicating the extraditee, statements which were later recanted by the witnesses on grounds that they were the product of coercion or torture. In both cases, the courts allowed the extraditee to introduce rebuttal evidence to ne-

gate probable cause. Although the instant case does not involve recantations of witnesses, it does involve a situation where the reliability of the government's identification is in question. In such a situation, the admission of evidence tending to negate probable cause is equally valid for the reasons cited.

In *Maguna–Celaya*, the district court granted habeas relief after a magistrate judge had entered an order of extradition to Spain. Spain's probable cause showing was based solely on the statements of four individuals. The court found that the magistrate judge had erred in excluding evidence that all four individuals had recanted their statements, alleging they had been coerced and tortured. There was substantial evidence of such torture, corroborated by statements of independent witnesses.

The court emphasized that due process protections apply in extradition proceedings:

> *** While the Court emphasizes that its role in the extradition process is unquestionably limited, the Court is also keenly aware of "the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution." *[United States v. Kin–Hong*, 110 F.3d 103] at 106 [ (1st Cir.1997) ].

*Id.* at 1342. The court stated that "competent evidence, rather than uncorroborated suspicion" must support the request for extradition. *Id.*

With respect to the magistrate's exclusion of rebuttal evidence based upon the distinction between "contradictory" and "explanatory" evidence, the court held:

> In reaching this conclusion, the Magistrate relied on an evidentiary distinction that has been established in extradition cases. Courts have held that while an individual charged with extradition may present evidence explaining the charges against him, he may not present evidence contradicting them. [citations omitted]. This "somewhat murky principle," *[In Re Extradition of]*

*Gill*, 747 F.Supp. 1028, 1040 [(S.D.N.Y. 1990) ], has often been cited by courts without explanation as to what constitutes evidence that explains and what constitutes evidence that contradicts. The court in *Gill*, however, noted that the "distinction, acknowledgeably 'difficult to articulate,' becomes less wooden when its purpose of preventing a full-scale trial, involving witnesses telling competing stories, is contemplated." *Id.* at 1044 (internal citation omitted). Therefore, courts refuse to allow defensive evidence, such as evidence of alibi or insanity, in order to prevent the extradition hearing from becoming a full-blown minitrial on the merits. *See Contreras*, 800 F.Supp. at 1464.

*Id.* at 1343.

The court held that evidence *negating* all bases for probable cause must be admitted, "because if the individual can successfully show the court that all bases for charging him are unreliable, then there is no evidence to support his extradition." *Id.*

In the *Contreras* case, the Southern District of Texas admitted evidence that eleven written statements identifying Contreras as the source of smuggled weapons, submitted by Mexico in support of his extradition, had been obtained by coercion. All of the declarants recanted their confessions and claimed that they were obtained under duress. The court carefully considered the evidence and concluded the recantations were reliable. The court held:

> *** Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause; or if the recantation only controverted a prior inculpating statement, then it would not rebut the probable cause evidence. However, where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane.

*Id.* at 1469. The court concluded that the statements were untrustworthy and not credible. Since no other evidence was submitted to establish that Contreras committed the offenses charged, the petition for extradition was denied.

 As in *Contreras* and *Maguna–Celaya*, this case presents a situation where the probable cause evidence submitted to the court so far—the identification of movers as the perpetrators by three eyewitnesses—lacks any indicia of reliability. Although there are no retractions in this instant case, there is other credible evidence which undermines, or "negates" the existence of probable cause: the alibi evidence. Under these circumstances, I conclude that it was proper to consider the alibi evidence in this case.

### CONCLUSION

Movers demonstrated at the bail hearings a substantial likelihood that they will be successful at the extradition hearing. The government's probable cause evidence at this point appears to be solely based upon impermissibly suggestive photo identifications. Furthermore, the government of Mexico has withheld key evidence which logically exists: descriptions of the perpetrators resulting from Mexico's investigation following the robbery. Against this, movers have presented credible and persuasive evidence that they were elsewhere on the date of the robbery and could not have perpetrated this crime. The latter evidence is admissible as evidence negating probable cause in this case. Finally, movers are not flight risks. Under these circumstances, release on bond is appropriate.